UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SYED BOKHARI, METRO LIVERY, INC., RICHARD SIMPKINS, and ALLEN VANPLIET, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) No. 3:11-00088<br>) Judge Sharp |
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, | )<br>)<br>)<br>) |
| Defendant. | ) |

## MEMORANDUM

Plaintiffs' multi-prong challenge to Metropolitan Government of Nashville and Davidson County ("Metro") Ordinance No. BL2010-685 (the "Ordinance") is before the Court on Plaintiffs' Motion for Preliminary Injunction (Docket No. 59). By way of that Motion, Plaintiffs Syed Bokhari ("Bokhari"), Metro Livery, Inc. ("Metro Livery"), Richard Simpkins ("Simpkins") and Allen VanPliet ("VanPliet") seek to enjoin enforcement of the $45.00 minimum fare requirement set forth in the Ordinance.

The parties have fully briefed the request for injunctive relief, and the Court held a day-long hearing on the Motion on April 2, 2012. For the following reasons, the Court denies the request for a preliminary injunction.[1]

---

[1] The Court also denies Defendant's Motion to Strike (Docket No. 64) which requests that the Court "strike any and all inadmissable statements from Plaintiff's Declarations and memorandum of law, or at a minimum, disregard those statements for purposes of ruling on the motion for preliminary injunction." (Id. at 1). The Court endeavors in all cases to avoid considering inadmissible evidence and, in ruling on Plaintiffs' request for preliminary injunctive relief, the Court, as stated at the hearing, will rely on the testimony which was received in evidence, and not upon the declarations which have previously been

1

# I. FACTUAL BACKGROUND

The basic factual allegations underlying this case are set forth in this Court's prior opinion denying Defendant's Motion to Dismiss, Bokhari v. Metro. Gov't of Nashville & Davidson County, 2012 WL 162372 (M.D. Tenn. Jan. 19, 2012), familiarity with which is assumed. According to Plaintiffs, eight days after that opinion, Defendant undertook a "sting operation" directed at Metro Livery, which resulted in that company being cited for violating the $45 minimum fare requirement.[2] Fearing that the "sting operation" was a sign of stepped-up enforcement directed at Plaintiffs for bringing this lawsuit, Plaintiffs filed the request for a preliminary injunction.

## A. Plaintiffs' Evidence

At the hearing, Plaintiffs presented the testimony of the owners/operators of two livery services, as well as testimony from two customers who use those services.

Bokhari has been the sole owner of Metro Livery since its inception in December 2005. At the time Metro Livery was founded, there were no city ordinances regulating the livery business.

Bokhari claims that from his previous experience driving a taxi cab, he saw certain problems with that industry and a niche which could be filled through an "affordable car service."[3] He

---

submitted.

[2] With regard to the "sting operation," Plaintiffs claim that Howard Morris, the former LaVergne police chief, using the *nom de guerre* Steve Michaels, arranged for a $25.00 ride from the Hotel Preston to downtown Nashville with Metro Livery. While in route, and under the guise of needing cigarettes, Morris told the driver to pull over at a gas station whereupon an inspector for the Metropolitan Transportation Licensing Commission ("MTLC" or "Commission") cited the driver for violating the minimum fare requirement. Several days later, Metro Livery received three more citations, apparently based upon MTLC's review of the driver's manifest for January 27, 2012.

[3] Bokhari testified that some customers do not like being ferried in taxi-cabs, prefer the discreteness of sedans or black cars, and do not want to call ahead hours in advance as required by most local limousine services. Moreover, most limousine companies do not provide services after midnight, Metro Livery operates around-the-clock.

developed a business model that competes directly with taxi cabs on price, while at the same time provides the type of "luxury" services of the more expensive limousine companies. His business model also focuses on customer service and relies on repeat business, with some customers using the service daily to go to and from work, or to run regularly scheduled errands.

Metro Livery has no minimum fare, although its average charge to customers is $25.00 to $35.00 per trip. At least 40% of its business provides rides costing $40.00 or less, and the average fare for a ride from the airport to downtown is $25.00 to $30.00. This pricing structure has allowed Metro Livery to grow rapidly, and it now has 35 vehicles in service – the vast majority of which are sedans or black cars.

Prior to its enactment, Bokhari voiced his opposition to the Ordinance. He did so by writing the Mayor and Council on July 9, 2009. Two of his employees, Boyd Kinzer and Theresa Anglin, spoke in opposition at a August 25, 2009 public hearing before the MTLC. Notwithstanding Metro Livery's protest, the Ordinance was passed on June 18, 2010.

Metro Livery intentionally has chosen not to comply with the Ordinance and, in fact, on its website boasts of $25.00 fares from the airport to downtown Nashville. Bokhari insists that his company cannot survive with the $45.00 minimum fare requirement in place and that, if the requirement is strictly enforced during the pendency of this case, he will likely be out of business within thirty days. Bokhari also testified that if the minimum fare is imposed, Metro Livery would be transformed into a traditional limousine service, and appeal to 10% of the population instead of appealing to 90% of the population as it does now. As anecdotal evidence of the problem enforcement of the minimum fare provision would impose on Metro Livery, Bokhari testified that sometime in 2010 or 2011 he raised rates an average of $5.00 to $10.00 per run, which led to a

3

decrease in revenue of 25 to 30 percent.

Bokhari recognizes that the minimum fare requirement does not prohibit passing out coupons for free rides. However, he believes this is an unworkable solution to the minimum fare problem because riders do not always use his services for the same route.

Alan VanPliet is the owner and operator of Southern Hospitality Limousine, which has been in existence since 2008. His business model is similar to that of Metro Livery's. It, too, is an "affordable car service," albeit with a significant twist. Eighty percent of Southern Hospitality's business involves rides in downtown Nashville and, for those rides, VanPliet charges no fare, relying instead on tips.

Like Bokhari, VanPliet claims the minimum fare requirement would ruin his business. Although he recognizes that the minimum fare requirement does not prohibit free rides, he believes runs outside of the downtown area, and particularly those to and from the airport would dry up. In fact, when he first started his business he had a flat rat of $20.00 to $25.00 for rides into downtown Nashville, but found that the business could not be sustained because a taxi cab ride was cheaper.

Mark Sissel ("Sissel") works for an artist management company in Nashville. His vision is poor enough that he must rely upon others for his transportation needs.

For the past six years, Sissel has used Metro Livery service, almost on a daily basis. Each morning Metro Livery takes him the 3.2 miles from his residence to his office for which he is charged a flat rate of $18.00. Although it would be cheaper for Sissel to use a cab, and significantly cheaper to ride the bus, those services are not as flexible and do not provide "the little bit of class" black cars provide. He claims that even if the car service provided a free coupon for the next ride,

4

the initial minimum fare is too much and he would be forced to go back to traveling by cab.[4]

David Clegg ("Clegg")is legally blind. Clegg also has certain other medical conditions and because of that he exclusively uses Metro Livery for his transportation needs, including going to and from the doctor's office and for trips to Kroger and Walmart. Generally, he uses the service at least three times per month, and has been doing so for the last five years. He is charged a flat fee of $25.00 for each trip.

Prior to relying on Metro Livery, Clegg traveled by taxi cab. However, taxi cab companies do not provide the customer service that Metro Livery does, including walking him into his doctor's office and into his home. Being on a fixed income, Clegg cannot afford a $45.00 minimum fare and stated that he does not know what he would do if that fee structure was enforced, although he would not go back to traveling by taxi.

**B. Defendant's Evidence**

At the evidentiary hearing, Defendant presented the testimony of Matthew Daus ("Daus") and Brian McQuistion ("McQuistion"). Daus is the head of the transportation practice group at the Windels, Marx law firm in New York City, a lecturer at the City University of New York, and previously served for over eight years as the Commissioner and Chairman of the New York City Taxi and Limousine Service. McQuistion is the Director of the MTLC.

Daus and his staff conducted a preliminary survey looking for jurisdictions in the country with minimum fare requirements for livery services. They found that nine jurisdictions[5] had

---

[4] Sissel concedes that it would be cheaper if, for example, Metro Livery charged him $45.00 on Monday and then provided him coupons for free travel the rest of the week.

[5] Those jurisdictions are Portland and Medford, Oregon; Austin and Houston, Texas; Miami and Hillsborough County, Florida; Little Rock, Arkansas; Atlanta, Georgia; and New Orleans, Louisiana.

5

enacted minimum fare requirements ranging from $25.00 to $70.00, with the one in New Orleans dating back to 1956. Based on that canvass, his discussion with regulators, and his longtime employment in fields involving ground transportation issues, Daus identified five general rationales for the imposition of minimum fares. Those rationales include: (1) an effort to differentiate between types or classes of licenses (e.g. taxi companies versus limousine services); (2) economic concerns, be it to ensure just compensation for drivers so that they will stay in the industry, or to ensure that vehicles will meet a certain standards; (3) preventing poaching so that limousine drivers do not encroach on taxi drivers' turf and vice versa; (4) preventing confusion so that customers have a clear understanding that when entering an un-metered ride for hire they can expect to pay a certain minimum amount; and (5) improving a city's transportation industry so that the city can attract more tourists and competitively bid on large events.

McQuistion testified that the Metro Code provisions establishing the MTLC required the Commission to establish regulations for ground transportation services. When he took office on April 1, 2004, that had been accomplished with respect to the taxi industry but not livery services.

Regulating the limousine car service industry was important in McQuistion's view because there were operators driving un-metered vehicles that were essentially operating as unregulated taxis. Having looked at ordinances in other jurisdictions, he saw two primary ways that cities could differentiate between taxi and non-taxi vehicles for hire. This could be accomplished by requiring that black cars have some sort of rate structure (such as minimum fares), and/or by requiring a time interval between reserving the transportation and the arrival of the vehicle for pick-up. McQuistion believed that differentiating between taxi and black car services was healthy for both industries because it allowed for competition of different types of services.

6

In early 2009, McQuistion started the process towards regulating the black car industry. Circulating a draft proposal for an ordinance that a predecessor had prepared years before, McQuistion sought input from the limousine service industry. After receiving comments, McQuistion sent out a revised draft to some forty companies or individuals, including Metro Livery and VanPliet. As the process went along, McQuistion received comments on proposals from the Tennessee Livery Association ("TLA"), a trade group representing the higher-end limousine companies.

Initially, McQuistion focused on the prearrangement time as a way to differentiate between taxis and other for-hire vehicles because he thought that would be easier to regulate than a minimum fare requirement. The third draft included prearrangement, as well as a $50.00 minimum fare requirement[6] which was proposed by the TLA. Recognizing that the minimum fare requirement might meet resistance, McQuistion informed those on his email list that this was a new provision which would be before the Commission at its August 2009 public hearing.

After hearing from those in attendance at the August 2009 public hearing, the Commission passed proposed regulations requiring a 15 minute prearrangement time (except for full service hotels in relation to the departure of overnight guests). The Commission also replaced the proposed language requiring a $50.00 minimum fare requirement with language allowing the Commission to set a minimum rate through its rule-making powers.

Upon presentment to the Metro Council, and at the behest of one of the Council members, the Commission's proposed regulations were amended on three occasions. As finally passed, the Ordinance had no prearrangement requirement, but did have a $45.00 minimum fare requirement.

---

[6] That draft also contained age limits and ownership requirement for vehicles used in livery services.

7

On June 18, 2010, the minimum fare requirement became effective upon enactment of the Ordinance. No one was cited for violating this requirement until Metro Livery was cited on January 27, 2012. McQuistion claims the lack enforcement was due to several factors, including limited resources, the Commission's focus on licensing, and the fact that there had been some efforts to repeal the minimum fare requirement. He also claims that Metro Livery was not the only company investigated for violating the ordinance, and it became the subject of investigation because there was evidence suggesting that it was not complying with the minimum fare requirement.

Since the enactment of the Ordinance, there have been efforts to repeal the minimum fare provision. McQuistion has urged the Metro Counsel not to repeal the minimum fare requirement unless it also inserts a prearrangement requirement because, in his opinion, one or the other is needed for effective enforcement.

## II. APPLICATION OF LAW

In deciding whether to grant an injunction pending a trial on the merits, the Court must consider four factors: (1) whether the party seeking injunctive relief has a strong likelihood of prevailing on the merits of the case; (2) whether the moving party will suffer irreparable injury if the injunction is not entered; (3) the potential harm the injunction would cause the opposing party or others; and (4) the public interest. See, Bays v. City of Fairborn, 668 F.3d 814, 818-19 (6th Cir. 2012); Tumblebus, Inc. v. Cranmer, 399 F.3d 754, 760 (6th Cir. 2005). "'These factors are not prerequisites which must be met, but are interrelated considerations that must be balanced together.'" Northeast Ohio Coalition for Homeless and Service Employees v. Blackwell, 467 F.3d 999, 1009 (6th Cir. 2006) (citation omitted); accord, United States v. Contents of Accounts, 692 F.3d 601, 608 (6th Cir. 2011). The Court "'is not required to make specific findings concerning each of

8

the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue.'" Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007) (quoting, Jones v. City of Monroe, 341 F.3d 474, 476 (6th Cir. 2003)).

**A. Likelihood of Success on the Merits**

"The first factor to consider is whether the plaintiff has demonstrated 'a strong likelihood of success on the merits.'" Id. Even though a plaintiff "'is not required to prove his case in full at a preliminary injunction hearing," a plaintiff is required to "'show more than a mere possibility of success.'" Id. (citations omitted).

In this case, Plaintiffs seek preliminary injunctive relief based upon their claim that the minimum fare requirement in the Ordinance arbitrarily interferes with their economic liberty in violation of the Fourteenth Amendment's Equal Protection and Due Process Clauses. Because there is no allegation the Ordinance impacts a suspect class or violates a fundamental right, review, as Plaintiffs concede, is under the "rational basis" standard. See, FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993) ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification").

Plaintiffs argue "[t]he analysis in this case is controlled by Craigmiles v. Giles, [312 F.3d 220 (6th Cir. 2002)] in which the Sixth Circuit struck down a funeral licensing law that prohibited unlicensed businesses from selling caskets." (Docket No. 60 at 16). The Court agrees that Craigmiles provides the appropriate framework for analysis in this case, but disagrees with

9

Plaintiffs' contention that Craigmiles requires granting the request for a preliminary injunction in this case.

At issue in Craigmiles was a portion of the Tennessee Funeral Directors and Embalmers Act, Tenn. Code Ann. § 62-5-101(a)(3), challenged on due process and equal protection grounds by plaintiffs who had established casket selling businesses. Specifically, the plaintiffs challenged the requirement in the act that those selling caskets in Tennessee be licensed funeral directors. The district court enjoined enforcement of that provision as to the plaintiffs' businesses.

In affirming the injunction, the Sixth Circuit observed that since no fundamental rights or suspect classifications were involved, review of the regulation was under the rational basis standard, "requiring only that the regulation bear some rational relation to a legitimate state interest." Craigmiles, 312 F.3d at 223. The court then went on to discuss the rational basis standard, writing:

> . . . Even foolish and misdirected provisions are generally valid if subject only to rational basis review. As we have said, a statute is subject to a "strong presumption of validity' under rational basis review, and we will uphold it "if there is any reasonably conceivable state of facts that could provide a rational basis." Walker v. Bain, 257 F.3d 660, 668 (6th Cir. 2001). See also, Heller v. Doe, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Those seeking to invalidate a statute using rational basis review must "negative every conceivable basis that might support it." Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973). Our standards for accepting a justification for the regulatory scheme are far from daunting. A proffered explanation for the statute need not be supported by an exquisite evidentiary record; rather we will be satisfied with the government's "rational speculation" linking the regulation to a legitimate purpose, even "unsupported by evidence or empirical data." FCC v. Beach Communications, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Under rational basis review, it is "'constitutionally irrelevant [what] reasoning in fact underlay the legislative decision.'" Railroad Retirement Bd. v. Fritz, 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980) (quoting, Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960)).

Id. at 223-24.

Notwithstanding "the slight review required by rational basis review under the Due Process

10

and Equal Protection clauses of the Fourteenth Amendment," id. at 229, the State of Tennessee in Craigmiles failed to provide a rational basis for requiring casket sellers to be licensed funeral directors. For example, the State argued that requiring licensure promoted public health and safety because funeral directors are trained to handle dead bodies and dispose of them properly, yet casket sellers do no handle dead bodies or dispose of remains. The State also argued about possible leakage from inferior caskets and the possible spread of contagious disease, a reason that had no rational basis given that bodies in Tennessee can be buried in homemade coffins or without a container at all. The State additionally argued the language in the statute was necessary because it brought casket sellers under the Federal Trade Commission's "funeral rule," but that rule itself defined a "funeral provider" as including one who "sells or offers to sell *funeral goods*." Id. at 227 (emphasis in original, citing 16 C.F.R. 453.1(j)). The State also claimed that funeral directors (unlike most casket sellers) receive psychological training to help relatives and loved ones during their time of profound loss, a claim which had no rational basis since "survivors must deal with a panoply of vendors in order to make funeral arrangements, from churches to food vendors for a wake, none of whom is required to have this psychological training." Id. at 228.

Here, in contrast, Defendant has set forth various possible reasons for enactment of the $45.00 minimum fare requirement, and Plaintiffs have failed to show that every one of those reasons has no rational basis.

Defendant claims that having a minimum fare requirement helps to differentiate between taxi companies and limousine services, helps to diminish confusion as to those services, and reduces poaching. There may be some merit to these contentions since there apparently had been some problems with poaching in the past, and a rider will come to expect a classier type of vehicle when

11

riding by black car, knowing there is premium to be paid for that privilege. Defendant also suggests that charging a minimum fare has some economic benefits, and may improve the ground transportation industry as a whole, thereby positioning Nashville to garner a larger tourism trade. There may be some merit to these contentions as well since increased fares could result in increased revenue to the limousine companies and translate into higher wages for the drivers and/or newer or better maintained vehicles. Better maintained and newer vehicles, in turn, may be attractive to a certain clientele, including some tourists.

However, to say that there may be "some" merit to the rationales proffered by Defendant is not to say that the Court disagrees with Plaintiffs' position that the minimum fare provision is inappropriate for Nashville, or that there are not more effective ways to regulate the limousine industry in this city. Indeed, virtually every reason advanced by Defendant can be legitimately criticized as insufficient to meet the goal intended.

For example, there is probably not a lot of confusion among the public as to taxi cabs and black car services, and thus no need to further differentiate between the two. After all, taxi cabs are clearly marked as such, they have toplights, and their fare amounts are metered. If additional distinctions need to be made between taxi cabs and black car services, that could be accomplished in any number of ways that do not implicate economic liberties.

Further, the whole notion that the $45.00 minimum fare advances economic concerns seems a bit paternalistic in a free market economy, and, in any event, presupposes many things. It presupposes that required minimum fares will result in more revenue for the limousine companies. It also presupposes that the additional money (assuming there is some) will be pumped back into the driver's pocket, or used for vehicle maintenance. It further presupposes and takes as a given that

12

the industry as a whole will benefit when, in fact, it could be that some companies are driven out of business and employees (including drivers) lose there jobs – leaving riders, dependent on their services, stranded.

Alas, what the Court may or may not think about the propriety of, or need for, a minimum fare is really of no moment. Legislative bodies "are accorded wide latitude in the regulation of their local economies under their police powers," they "may implement their program step by step in . . . economic areas, adopting regulations that only partially ameliorate a perceived evil," and "the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976). As previously noted, "even foolish and misdirected provisions are generally valid" under the rational basis standard of review, Craigmiles, 312 F.3d at 223, and "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." Northville Downs v. Granholm, 622 F.3d 579, 586 (6th Cir. 2010).

All that said, "Courts have repeatedly recognized that protecting a discrete interest group from economic competition is not a legitimate governmental purpose." Id. at 224. Even so, "[j]udicial invalidation of economic regulations under the Fourteenth Amendment has been rare in the modern era," and, indeed, "[o]nly a handful of provisions have been invalidated for failing rational basis review." Id at 225 & 229. Unlike Craigmiles, which was decided after a trial on the merits, at this stage Plaintiffs have yet to establish that the minimum fare requirement should be among the handful of provisions that are invalidated under rational basis review.

The Court recognizes Plaintiffs' position that the insertion of a minimum fair provision was

13

done to favor the TLA, an organization which is said to represent the high-end limousine companies. Indeed, the language used for this provision appears to have come directly from the TLA's "mark up" of an earlier draft. However, that was not the only organization heard by the Commission and, in fact, Plaintiffs also provided their comments on the proposed regulations.

Additionally, the proposed Ordinance sent to the Council by the Commission called for subsequent rule-making by the Commission on minimum fares and a prearrangement time, neither of which was adopted by the Council as presented. Instead, the Council gutted the prearrangement provision, and inserted a set minimum fare of $50.00 that was subsequently reduced to $45.00. Given the limited evidence in the record, it would be speculative at this point for the Court to find that this was done to favor the membership of the TLA, as opposed to being done for some legitimate purposes.

Moreover, the enactment of a minimum fare structure for limousine services has been approved by a federal appellate court. In Executive Town & Country Serv's, Inc. v. City of Atlanta, 789 F.2d 1523 (11th Cir. 1986), the United States Court of Appeals for the Eleventh Circuit was presented with an Atlanta ordinance that regulated the fares which licensed limousine service companies could charge for trips to and from the Atlanta Hartsfield Airport.[7]

Although the bulk of the court's decision in Executive Town dealt with challenges to the ordinance under the Commerce Clause, the Eleventh Circuit rejected a Fourteenth Amendment

---

[7] On appeal, the City argued a minimum fare provision ensures: "1) that each of [the different] modes of transportation can find a niche in which to fit in the City's transportation network; (2) that everyone within the City, no matter what his level of affluence, has affordable transportation available; (3) that the operators of each type of transportation [must] earn enough to permit them to meet the operational requirements (e.g., insurance, maintenance, etc.) which have been set by the City; and (4) that each of these different modes will be able to attract the custom of a sufficient number of patrons to maintain its economic viability." Id. at 1527 n.8.

14

challenge because plaintiff had not satisfied its burden of proving that there was no possible legislative rationale for enactment of the minimum fare provision. Nevertheless, the Eleventh Circuit pointedly observed "[t]he city's reasons for legislating these minimum fare regulations are not very compelling in a free market system," and the "regulations pass[] the 'rational basis' test, albeit with little room for comfort." Id. at 1528 (footnote omitted).

Likewise in this case, Defendant's rationale is not overly compelling, and the near wholesale use of TLA's draft legislation seems a bit fishy. But at this point, the process which led to the insertion of the minimum fare provision does not strike the Court "with 'the force of a five-week-old, unrefrigerated dead fish, . . . a level of pungence almost required to invalidate a statute under rational basis review.'" Craigmiles, 312 F.3d at 225 (citation omitted). Accordingly, the Court concludes that Plaintiffs have not shown a substantial likelihood of success on the merits.

## B. **Irreparable Harm to the Plaintiffs**

In their moving papers, Plaintiffs claim they will suffer irreparable harm for two reasons. First, the denial of a constitutional right is an irreparable harm because the same cannot be compensated with money damages. Second, Plaintiffs argue that enforcement of the Ordinance as to them will result in confusion[8] and the loss of customer goodwill. Further, at the evidentiary hearing, Plaintiffs suggested that strict enforcement of the provision will result in the collapse of their businesses, with Bokhari claiming that he will be out of business in thirty days.

Plaintiffs rely on Overstreet v. Lexington-Fayette Urban County Gov't, 305 F.3d 5656 (6th Cir. 2002) for the principle that denial of a constitutional right constitutes irreparable harm. While

---

[8] Any confusion about the fares may be Plaintiffs' own doing because, had they complied with the Ordinance from the beginning, all limousine services would be charging the same amount.

15

that case does stand for the proposition advanced by Plaintiffs, it also states that to establish irreparable harm based upon the denial of a constitutional right, the plaintiff must first show a substantial likelihood of success on the underlying constitutional claim, which Plaintiffs have not yet done in this case. Id. at 578 ("The Court has already discussed the fact that it is unlikely that [plaintiff] will be able to demonstrate that he has a cognizable constitutional claim. Thus, his argument that he is entitled to a presumption of irreparable harm based on the alleged constitutional violation is without merit.").

As for Plaintiffs' other assertions – the potential loss of the business and the loss of good will – it is clear that these things can amount to irreparable harm. See, Warren v. City of Athens, 411 F.3d 697, 711-712 (6th Cir. 2005) (plaintiffs showed irreparable harm by showing they would "likely go out of business"); Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373, 1382 (6th Cir. 1995) ("financial ruin qualifies as irreparable harm"); Basicomputer Corp. v. Scott, 973 F.2d 507, 511-12 (6th Cir. 1992) (competitive losses and the loss of customer goodwill constitute irreparable harm). Even though Plaintiffs' forecast of impending economic doom and loss of goodwill are somewhat speculative and conclusory, the Court recognizes these are real possible eventualities and, after considering the arguments of the parties, finds that the irreparable harm factor tips in Plaintiffs' favor.

## C. Substantial Harm to Others

"The third factor for a court to consider is 'whether the issuance of the injunction would cause substantial harm to others.'" Certified Restoration, 511 F.3d at 550-51. In this case, there may be some harm to others, but the Court cannot say that the harm is substantial.

If the Court denies the requested injunction and Plaintiffs decide to comply with the

16

minimum fare requirement, riders like Clegg and Sissel will either have to pay more for their trips (assuming that Plaintiffs do not issue coupons for free rides), or else resort to other means of transportation, including taxi-cabs. While Sissel does not like that prospect, and Clegg claims he will not utilize a taxi service, and while both will certainly be inconvenienced, the Court cannot say that the harm to them will be substantial.

On the other hand, Defendant's argument that other limousine services will be harmed if the Court allows just a couple of limousine services to ignore the minimum fare requirement has some facial validity. However, the Court does not know the true extent of that harm.

### D. The Public Interest

The last factor in determining whether to grant a preliminary injunction "asks whether the public interest is advanced in issuing" the order. National Hockey League Players Ass'n v. Plymouth Whalers Hockey Club, 372 F.3d 712, 720 n. 4 (6th Cir. 2003). This has been described as a "somewhat nebulous" factor, International Sec. Management Group, Inc. v. Sawyer, 2006 WL 1638537 at *8 (M.D. Tenn. 2006), and it certainly is in this case.

Nashville citizens and tourists who visit this city would undoubtedly benefit by being able to pay less than $45.00 for limousines rides. However, and as already noted, what is best for Nashville in terms of regulating the ground transportation industry is not a decision for this Court to make. That decision lies with the Metro Council. It has spoken through the enactment of the challenged Ordinance, and rational basis review begins with the premise that "legislation is presumed to be valid[.]" City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).

### III. CONCLUSION

"A preliminary injunction is an extraordinary remedy never awarded as of right," and,

therefore, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat'l Resources Defense Council, Inc., 555 U.S. 7, 20 & 24 (2008). Because present Plaintiffs as of yet have failed to carry this burden, their Motion for a Preliminary Injunction will be denied. Defendant's Motion to Strike will be denied as moot.

      An appropriate Order will be entered.

                                                    _/s/ Kevin H. Sharp_____
                                                    KEVIN H. SHARP
                                                    UNITED STATES DISTRICT JUDGE